UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  19-CIV-80369-MARRA

JOSEPH GARDI,

      **Plaintiff,**

vs.

UNITED HEALTHCARE SERVICES, INC.,

      **Defendant.**

_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Joseph Gardi ("Gardi") brings this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§1001 *et seq*., challenging United Healthcare Services, Inc.'s ("United's") denial and alleged underpayment on claims presented under his ERISA-governed health insurance policy. The case is now before the Court on United's Motion for Summary Judgment [DE 89], Plaintiff's Response in Opposition [DE 97] and Defendant's Reply [DE 131].

Having carefully considered the parties' submissions, the evidentiary record, the applicable law and the parties' proposed findings on summary judgment, the Court concludes that United is entitled to summary judgment on all claims in dispute and shall enter final summary judgment accordingly.

## I.     BACKGROUND[1]

Plaintiff Joseph Gardi has been a participant in the HCA Health and Welfare Benefits Plan ("the Plan") since at least January 1, 2018 [DE 64 ¶1]. The Plan is an ERISA-covered health insurance plan sponsored and self-funded by HCA Inc. ("HCA"), which employed Gardi's ex-wife. Defendant United Healthcare Services, Inc. is the Plan's third-party claims administrator.[2]

As relevant to the issues posed by Gardi's current Complaint, the Plan allocates responsibility between the allowable amount payable by the employer (as benefits) and the amount payable by the participant or beneficiary (as deductible or coinsurance) for covered medical expenses.   With respect to network providers, the allowable amount is the discounted rate negotiated between the provider and United [Stalinksi Affidavit at ¶ 6]. With respect to out-of-network providers, the allowable amount is the negotiated rate specified in a contract between United and the provider (or some other party), if one exists; if none exists, then 300 percent of the Medicare reimbursement rate for the same or most analogous service [Id. at ¶7].

---

[1] The recited facts are based on the parties' submissions of fact, including the administrative record, and are undisputed unless otherwise noted. Under Local Rule 56, "[a]ll material facts set forth in the movant's statement" of material facts "will be deemed admitted unless controverted by the opposing party's statement, provided that the Court finds that the movant's statement is supported by evidence in the record." L.R. 56.1(b).

[2] HCA and United entered into an Administrative Services Agreement under which United serves as the Plan's third-party administrator in those certain categories of claim relevant here.  Section 2.1(c) of the Agreement states:

HCA hereby delegates to United the authority, responsibility, and discretion to review and decide all first and final level internal appeals with respect to Pre-Service Claims, Concurrent Care Claims and Urgent Care Claims, as those terms are defined under ERISA and regulations thereunder.

[DE 90-1 at 1] [Affidavit of Jane Stalinski, United Senior Legal Services Specialist].

In his Second Amended Complaint, Gardi specifically alleges that "all claims at issue in this Complaint are urgent care claims, concurrent care claims, and/or preservice claims within the meaning of the Plan." [DE 64 ¶ 13].

The HCA Plan in which Gardi participated is a "Level 3" plan, meaning that for most services provided by network providers, the benefit payable is 80 percent of the allowable amount, with the remaining 20 percent payable by the participant as a coinsurance obligation. A network provider may collect the coinsurance amount from a participant but may not balance-bill the participant for any amount more than the allowable amount [Id. at ¶13]. For out-of-network services, the benefit payable is usually 25 percent of the allowable amount, with the remaining 75 percent representing the claimant's coinsurance obligation. An out-of-network provider may collect the co-insurance amount and balance-bill the participant for amounts more than the allowable amount calculated under the Plan [Id. at ¶ 14].

Once a claimant's deductible and coinsurance payments exceed the prescribed annual cap or applicable "out of pocket maximum" for any calendar year, the coinsurance requirement no longer applies, and the Plan covers 100 percent of the allowable amount. However, the cap may be met only through services rendered by network providers and through out of network services approved for treatment as network services under the "gap exception" of the Plan. Thus, out of pocket expenses incurred by a participant for out-of-network services which were not approved for gap coverage are not counted toward the annual cap [Id. at ¶¶ 10-12, 14-15].

A "gap" in the provider network is deemed to exist where no network provider is available to provide a service to a participant. In this instance, the participant may request an "upgrade" i.e., apply for a "gap exception" which would allow the out-of-network provider to be treated as network provider for purposes of coinsurance. If granted for a particular service (under an assigned procedure code), the Plan will treat the out-of-network service as a network service for purposes of coinsurance and out of pocket maximum calculations [Id at ¶17]. In other words, with a "gap exception" in place, the participant's coinsurance obligation for an out of network service is the

3

same as that for a network service – 20% instead of 75% (or zero if the out-of-pocket annual maximum has been exceeded) [*Id.* at ¶18].

### A. Claims in Dispute

Gardi filed this action on March 17, 2019. His now operative Second Amended Complaint [DE 64] contains a single-count denial of benefits claim under ERISA §502(b)(3)[3] and as pertinent to the instant motion describes two primary categories of alleged benefit miscalculations involving out-of-network services (the primary category of disputed claims): First, in some instances Gardi says United miscalculated the "allowable amount" for out of network services rendered under an approved "gap exception" by drawing from a Medicare-based rate, rather than the negotiated rate between the provider and United. Although he does not allege or show the existence of a contract establishing a negotiated discount rate between United and the provider, he argues the existence of such a rate may be implied from a prior two-year course of conduct between those parties during which United consistently defined the allowable amount by reference to the provider's fully billed charges [DE 96 at 5-6].

Second, in other instances Gardi says United miscalculated his coinsurance obligation by narrowly construing gap coverage on a service-specific basis (corresponding to specified billing codes) as opposed to a facility-specific basis. As Gardi views it, a grant of gap coverage under the Plan should extend on a facility-wide basis,[4] and United abused its discretion by refusing to honor

---

[3] In earlier proceedings, this Court dismissed with prejudice Gardi's claims for extracontractual damages and "other monetary relief" and dismissed with prejudice his claims for prospective injunctive relief [October 21, 2020, Order Partially Granting Defendant's Motion to Dismiss] [DE  73 at 8].

[4] As support for this proposition, Gardi cites the following Plan excerpts: "In the event services are not available at an HCA-affiliated facility, you may receive network-level benefits from a non-HCA affiliated facility;" "It is your responsibility to pre-certify and request such an upgrade for the facility;" "Out of pocket maximum does not apply for out-of-network facilities without Claims Administrator upgrade."  [DE 96 at 3, citing UHC 000026, 000030]. Gardi does not explain, nor does the Court discern, how this language jars with United's position that gap coverage approval

4

claims for all services provided by any gap-approved facility [DE 96 at 2-3].  As a result, Gardi claims he was erroneously shouldered with a 25% out-of-network reimbursement rate on certain services (provided by gap-approved out-of-network providers) instead of the 80% network rate to which he was entitled.

Gardi claims that United "arbitrarily, recklessly, and in bad faith denied or underpaid on hundreds of claims for medically necessary treatment rendered to Plaintiff" because of these claimed errors and other inconsistent and "dysfunctional" benefit claim practices and engaged in an "unconscionable" course of conduct that deprived him of benefits owed under the Plan and contributed to the progressive deterioration of his health [DE 64 ¶¶ 5, 39].

### B. Administrative Appeals

When United denies a claim, it must provide written notice to the plan participant of the reasons for its denial. In the Explanation of Benefits ("EOBs") forms issued by United, it advises plan participants of their right to request a review of its benefits determinations and provides an address to which appeals must be sent.  It also cautions that plan participants may file a civil ERISA action only after all required levels of internal review prescribed by the Plan have been completed. [Russell Affidavit, DE 90-2, ¶¶ 6-7]. The Plan requires that all appeals be filed initially with United, with a second level of appeal to HCA available in a certain category of cases involving medical post-service claims [DE 90-1 at 175, 400].

---

depended on the availability of network services, and that gap approval for some services provided by an out of network provider (under specified procedure codes) did not necessarily translate into an across-the-board approval for *all* services rendered by that out-of-network provider.  The Plan language specifying that a request for a "facility" upgrade must be made, in order to qualify for gap coverage,  could reasonably be read in conjunction with the language limiting gap coverage in the first instance to situations where "services are not available at an HCA-affiliated facility" to mean gap coverage extended on a service-specific basis to services rendered by approved out of network providers, and United did not abuse discretion in interpreting the Plan in this fashion.

United claims that Gardi failed to exhaust administrative remedies as prescribed by the Plan in the bulk of claim line entries in dispute. As evidence of the relevant administrative appeal history, United supplies the affidavit of its Director of Appeals Operations, Renee Russell, who avers that a search of United's electronic data bases reveals no appeals for 481 claim line entries out of the total 498 claim line entries remaining in dispute.[5]  Gardi disputes these numbers, submitting the affidavit of his attorney, Dana Berkowitz, who challenges the accuracy of United's appeal records, and who purports to produce documentation relating to administrative appeals lodged by Gardi in hundreds of the claim line entries in dispute [DE 98].

In its Reply, United contends that the correspondence produced by Berkowitz at best suggests that Gardi sought reconsideration of alleged benefit miscalculations from HCA -- the plan sponsor - on 131 of the claim line entries in dispute.  In other words, United contends that the correspondence shows Gardi lodged a first level appeal with the wrong entity.  Thus, United argues Attorney Berkowitz does not supply evidence of an exhaustion of *all required levels* of internal review prescribed by the Plan documents, citing *Lucas v. Warner & Swasey Co.,* 475 F. Supp 1071, 1075 (E.D. Pa. 1979) (a plan beneficiary who sent internal appeal to wrong entity failed to exhaust administrative remedies).  In addition, United shows that documents relating to twelve

---

[5] Russell's affidavit, submitted in conjunction with United's initial motion, states that she has reviewed a spreadsheet of 770 claim line entries originally identified as claims in dispute -- and that United's electronic databases reveal that at most only 105 of those line entries were the subject of an administrative appeal. She identifies these exhausted claims by line entry number and avers United's electronic records otherwise show no record of an administrative appeal ever taken in the remaining group of claims originally in dispute [Russell Affidavit, DE 90-2 at para 11].

The parties have since narrowed the pool of claim line entries in dispute, and United identifies 481 of these claim line entries as among the pool of unexhausted claims originally outlined by Russell.

other appeals referenced in the Berkowitz Affidavit [DE 98, ¶¶10-11; DE 98-5] have no relation to any of the claim line entries in dispute in this litigation.

### B.  Summary Judgment Posture

 United's motion  for summary judgment is directed to the hundreds of claim line entries remaining in contention as identified by the parties during preliminary discovery proceedings -- 498 claim line entries consisting of the 497 claim line entries identified in footnote no. 1 of United's Reply in Support of its Motion for Summary Judgment [ECF No. 131], plus Claim Line Entry No. 505.[6]   Within this claim pool, United argues that Gardi failed to exhaust his administrative remedy in 481 of the 498  disputed claim line entries, requiring dismissal of the claims. United also claims, on the merits of its benefit determinations, that Gardi fails to show United abused discretion in its interpretation and application of the Plan terms.   As to the claims United recognizes as exhausted – a category it describes as now consisting of seventeen claim line entries -- United argues Gardi fails to carry his burden of showing that United abused its discretion in its Plan interpretation and benefit calculations drawn from its Plan interpretation.

As noted, Plaintiff disputes the number of unexhausted claims subsumed within the remaining claim line entries in dispute.  Further, on all claims in dispute, he argues United erred and abused discretion in its benefit calculations resulting in broad patterns of underpayment. Finally, Gardi contends that United is not entitled to a final summary adjudication of all claims  in

---

[6] The 498 claim line entries which the parties agree constitute the remaining disputed claim pool  are: Nos. 1–28, 30–86, 89–95, 97–120, 123–203, 207–234, 237–240, 243, 245–274, 277–291, 295–301, 304–07, 316, 317, 320–25, 329, 358, 447, 448, 457, 458, 461, 462, 498–503, 505, 518, 519, 522, 523, 544, 550, 551, 557–68, 585, 587, 589–92, 599– 739, 741, 743, 744, 747–764, 767, and 769.

As to claim line entry No. 505, Plaintiff has since indicated, in his most recently filed proposed findings on summary judgment, that he is no longer seeking recovery on this claim.

any event  because its motion  "ignores" or fails to parse its benefit determinations with regard to forty-one (41) of the claim line entries in dispute,  and it neglects his claim for "forgone benefits" i.e. the claim for compensation for medical therapies he was forced to forego, as a matter of economic necessity, when United began denying or underpaying on the claims.[7]

## II.    STANDARD OF REVIEW

ERISA was enacted "to promote the interests of employees and their beneficiaries in employee benefit plans and to protect contractually defined benefits." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 113, 109 S. Ct. 948, 103 L.Ed.2d 80 (1989).  To this end, ERISA provides a cause of action for a participant or beneficiary of a plan covered under ERISA to bring a civil action "to recover benefits due to him or her under the plan's terms, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. §1132 (a)(1)(B).

A denial of benefits challenged under ERISA is reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine a claimant's eligibility for benefits, in which case the administrator's decision is reviewed for abuse of discretion. *Firestone,* 489 U.S. at 115; *Cosey v. Prudential Ins. Co. of America,* 735 F.3d 161, 165 (4th Cir. 2013).  Under *de novo* review, "the court review[s] the employee's claim as it would have any other contract claim – by looking to the terms of the plan and other manifestations of the parties' intent." *Firestone,* 489 U.S. at 112-13.  Applying the *de novo* standard, "[t]he Court must

---

[7] In his summary judgment papers, Gardi contends he is entitled to the Court's "quantification" of these damages, either by way of prospective order injunctive relief (by an order requiring United to honor future claims in the nature of "make up" benefits for forgone IGG therapy, hyperbaric therapy, and myofascial release therapy) or by way of monetary compensation for the estimated value of such benefits.

consider, based on the record before the administrator at the time its decision was made, whether the court would reach the same decision as the administrator." *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir. 2009).  In making this determination, no deference is given to the administrator's decision; rather, the Court "stand[s] in the shoes of the administrator and start[s] from scratch, examining all the evidence before the administrator as if the issue had not been decided previously." *Bates v. Metro. Life Ins. Co.,* 2009 WL 2355834 at \*10 (M.D. Ga. 2009). *See also Williams v. BellSouth Telecomm, Inc.*, 373 F. 3d 1132, 1134-35 (11th Cir. 2004); *Shaw v. Conn. Gen. Life Ins. Co.,* 353 F.3d 1276, 1284 n. 6 (11th Cir. 2003) (citing *Moon v. Am. Home Assur. Co.*, 888 F.2d 86, 89 (1989)).

In contrast, when the administrator is conferred discretionary decision-making authority under a plan, its decision is reviewed under an arbitrary and capricious standard of review.  To trigger arbitrary and capricious review, "the plan documents at issue [must] explicitly grant the claims administrator discretion to determine eligibility or construe the terms of the plan." *HCA Health Services of Ga., Inc. v. Employers Health Ins. Co.,* 240 F.3d 982, 993 (11th Cir. 2001*); Kirwan v. Marriott Corp.,* 10 F.3d 784, 789 (11th Cir. 1994) (discretionary authority must be stated in "express language' in the plan document that is "unambiguous in its design to grant discretion regarding entitlements to the fiduciary or administrator); *Moon v. American Home Assurance Co.,* 888 F.2d 86, 88-89 (11th Cir. 1989) (discretionary authority cannot be implied but must be expressly given by the plan). *See also Perugini-Christen v. Homestead Mortgage Co*., 287 F.3d 624, 626 (7th Cir. 2002) (to lower the standard of review to abuse of discretion, "the plan should clearly and unequivocally state that it grants discretionary authority to the administrator"). Put another way, plenary review is presumed absent clear language to the contrary.  *Herzberger v. Standard Ins. Co*., 205 F.3d 327, 331 (7th Cir. 2000).

9

Under the abuse of discretion standard, "the function of the court is to determine whether there was a reasonable basis for the decision based upon the facts as known to the administrator at the time the decision was made." *Jett v. Blue Cross & Blue Shield of Ala., Inc*., 890 F.2d 1137, 1139 (11th Cir. 1989).  *Cf. Helton v. AT & T, Inc.,* 709 F.3d 343, 351 (4th Cir. 2013) (court will "affirm a discretionary decision of a plan administrator if it is the result of a 'deliberate, principled reasoning process' and is supported by 'substantial evidence,' even if [the court] would reach a different decision independently").  In determining whether an administrator's decision-making process was reasonable, courts may not "require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physicians' evaluation." *Black & Decker Disability Plan v. Nord,* 538 U.S 822, 834 (2003). However, plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id*.

The Eleventh Circuit Court of Appeals has established the following multi-part test for reviewing a claim administrator's benefits decision under an ERISA plan:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether [the administrator] was vested with discretion in reviewing claims; if not, end the judicial inquiry and reverse the decision.

> (3) If the administrator's decision is "*de novo* wrong" and [it] was vested with discretion in reviewing claims, then determine whether "reasonable" grounds

supported it (hence, review [the administrator's] decision under the more deferential arbitrary and capricious standard). [8]

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if [the administrator] operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to consider when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011).

Finally, while this matter is before the Court on a motion for summary judgment, in an ERISA benefits denial case "the district court sits more as an appellate tribunal than as a trial court." *Curran v. Kemper Nat'l Servs., Inc.*, 2005 WL 894840 at *7 (11th Cir. 2005) (quoting *Leahy v. Raytheon Co.*, 315 F.3d 11, 17 (1st Cir. 2002)). "It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record complied before the plan fiduciary." *Id.*

For this reason, the summary judgment standard in ERSIA cases is different than the ordinary summary judgment standard applicable in other cases. *Ruple v. Hartford Life & Accident Ins. Co.*, 340 Fed. Appx. 604, 610 (11th Cir. 2009) (per curiam) ("The usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply"); *Jones v. Federal Express Corp.,* 984 F. Supp.2d 1271, 1275 (M.D. Fla. 2013). In the ERISA context, there

---

[8] Where a plan vests the claims administrator with discretion to "construe the terms" of the Plan and determine eligibility for benefits under the Plan, the district court may assume the benefits decision was *de novo* wrong and begin its analysis at step three. *See Mickell v. Bell/Pete Rozell NFL Players Ret. Plan,* 832 Fed. Appx. 586, 591 (11th Cir. 2020); *Wright v. Reliance Standard Life Ins. Co.*, 844 Fed. Appx. 141, 144 (11th Cir. 2011). In this scenario, the claimant bears the burden of proving that he or she is entitled to ERISA benefits and that the administrator's denial was arbitrary and capricious. *Wright,* 844 F. Appx. at 144; *Glazer v. Reliance Standard Life Ins. Co* 524 F.3d 1241, 1247 (11th Cir. 2008).

11

"may indeed be unresolved factual issues evident in the administrative record, but unless the administrator's decision was wrong, or arbitrary and capricious, these issues will not preclude summary judgment as they normally would." *Pinto v. Aetna Life Ins. Co*., 2011 WL 536443, at *8 (M.D. Fla. 2011); *Miller v. PNC Financial Services Group Inc.*, 278 F. Supp. 3d 1333, 1341 (S.D. Fla. 2017).

## III.   ANALYSIS

### A. Gardi failed to exhaust administrative remedies on 481 of the 498 claim line entries in dispute.

#### 1.   General exhaustion precepts

"The law is clear in this Circuit that plaintiffs in ERISA actions must exhaust available administrative remedies before suing in federal court." *Lanfear v. Home Depot, Inc*., 536 F.3d 1217, 1223 (11th Cir. 2008).  *See also Watts v. BellSouth Telecommunications, Inc.*, 316 F.3d 1203, 1207 (11th Cir. 2003); *Variety Children's Hosp., Inc., v. Century Med. Health Plan, Inc*., 57 F.3d 1040, 1042 (11th Cir. 1995). Because of the important policies underpinning the exhaustion requirement, it is "strictly enforce[d] on plaintiffs bringing ERISA claims in federal court with certain caveats [being] reserved [only] for exceptional circumstances." *Perrino v. S. Bell Tel. & Tel. Co*., 209 F.3d 1309, 1315 (11th Cir. 2000).

As explained by the Eleventh Circuit, these policies include "reduc[ing] the number of frivolous lawsuits under ERISA, minimiz[ing] the cost of dispute resolution, enhanc[ing] the Plan trustees' ability to carry out their fiduciary duties expertly and efficiently by preventing premature judicial intervention in the decision-making process and allow[ing] prior fully considered actions by [] trustees to assist courts if the dispute is eventually litigated." *Mason v. Continental Group Inc*., 763 F.2d 1219, 1227 (11th Cir. 2000).

A district court has discretion to excuse the exhaustion requirement in two narrow circumstances: (1) where a claimant makes a "clear and positive showing" that resort to administrative remedies "would be futile or the remedy would be inadequate" or (2) when the claimant is denied "meaningful access to the administrative review scheme in place." *Counts v. American Gen. Life & Acc. Ins. Co.,* 111 F.3d 105, 108 (11th Cir. 1997).

However, an ERISA claimant cannot avoid his obligation to exhaust administrative remedies on "futility" grounds simply by asserting he feared or anticipated that the administrator would deny his appeals based on an approach adopted in the course of an adverse claim history. *Greifenberger v. Hartford Life Ins. Co.,* 131 Fed. Appx. 756, 759 (2d Cir. 2005) (lack of exhaustion not excused by administrator's initial unreasonable denial of benefits); *Davenport v. Harry N. Abrams, Inc.,* 249 F.3d 130, 133-34 (2d Cir. 2001) (allowing informal attempts to substitute for formal claims procedure would frustrate the primary purposes of the exhaustion requirement); *Wilson v. Globe Specialty Prods.,* 117 F. Supp.2d 92, 99 (D. Mass. 2000) (plan administrator "arguably [had] evidenced an intent to refuse [plaintiff's] claim," but court required exhaustion because it would "not predict how [the administrator] would have decided [plaintiff's] claim on review"); *Sibley-Schreiber v. Oxford Health Plans (N.Y.), Inc.,* 62 F. Supp 2d 979, 986 (E.D.N.Y. 1999) (allegation of futility not satisfied by mere showing that a claim was denied when initially presented to the insurance company); *Canale v. Yegen*, 782 F. Supp. 963, 972 (D.N.J. 1992) ("clear and positive" showing of futility required to merit excusal from exhaustion requirement).

This follows because futility turns not on the likelihood of success, but rather on whether the claimant could have availed himself of the grievance procedure. *See, e.g., Mason v. Cont'l Grp., Inc.,* 763 F.2d 1219, 1224 (11th Cir. 1985); *Lanfear v. Home Depot, Inc.*, 536 F.3d 1217, 1225 (11th Cir. 2008) (futility exception is about meaningful access to administrative proceedings,

13

not a potential conflict of interest of the decisionmakers); *La Ley Recovery Systems-OB, Inc. v. UnitedHealthcare Ins. Co.*, 2015 WL 12977396, at *6 (S.D. Fla. 2015), *aff'd*, 654 F. Appx. 1017 (11th Cir. 2016) ("denial of meaningful access often consists of deliberate, improper actions by an insurer to block otherwise proper access to the appeals process").

### 2. Application

Given the dispute between the parties on the contents of Gardi's administrative appeal record, and corresponding ambiguity in the evidentiary record on the point, the Court requested post-briefing submissions from both parties in effort to clarify, among other things, whether and to what extent administrative review was sought and exhausted by Gardi on each of the claim line entries which remain in dispute [DE 133]. The Court directed United to address each allegedly unexhausted claim line entry in dispute, in separately numbered paragraphs, with a description of the provider; the medical service; the dates of service; the basis of its original claim determination, and its position on Gardi's asserted futility defense [DE 133 at 2, ¶1]. It directed Gardi, in turn, to set forth his proposed findings on each of the claim line entries in dispute, in separately numbered paragraphs, and to set forth his "specific objections" to the Defendant's position on each of those claim line entries. Further, where objection was lodged, Gardi was directed to "identify the underlying factual matters … which furnish the basis of his opposition as [to] each specific line item in question" [DE 133 at 2-3, ¶2].

In United's supplemental submission, it reiterates its position on Gardi's failure to exhaust administrative remedies and puts forward a position statement on the applicability of the "futility" defense for each claim it identifies as unexhausted [DE 136]. Gardi's supplemental submission, however, does not touch upon the exhaustion issue. Instead, in a 547-page document outlining his

proposed findings on summary judgment, he reiterates his coverage theories about United's alleged misinterpretation of gap exception coverages and reimbursement rates [DE 137-2].

In a separately filed "letter" to the Court, signed by counsel, Gardi goes on to address certain "outstanding issues" which he contends are not reached by United's motion, and purports to "clarify" his position on exhaustion "with respect to each claim line entry" in dispute [DE 137-1, at 2]. However, instead of responding to United's exhaustion challenge on the 481 claims which United has identified as unexhausted and supplying the Court with specific record citations which identify the formal appeal document corresponding to each such claim, Gardi basically repackages the same broad-stroke arguments made in his Opposition. In doing so, Gardi makes no effort to address or refute United's contention that 131 of the claims referenced in the Berkowitz Affidavit as the subject of prior appeals at best corresponded to requests for administrative review sent to the wrong entity (HCA) and makes no effort to address United's contention that there is no documentation of any administrative appeal history on the remaining 350 disputed claim line entries identified as unexhausted.

On the issue of futility, Gardi's supplemental letter to the Court further expounds that he "was not required" to file further appeals after United continued to deny new claims submitted by Hyperbaric Therapy of Brook Park ("HTBP"), because it was apparent United "had made a conscious binding decision about how to adjudicate these issues" and it would therefore be an "empty exercise in legal formalism" to require him to appeal internally, on successively denied claims, before seeking judicial intervention.

As Gardi has not directed the Court to specific pages in the evidentiary record showing documentation of a formal administrative appeal corresponding to each claim line entry in dispute, and as he has not responded to United's challenge to the relevancy and competency of the

15

Berkowitz Affidavit, with "specific objections" supported by a specific factual predicate furnishing the basis of those objections, the Court concludes United's proofs on Gardi's failure to exhaust at each prescribed level of internal review remain unrebutted. Summary judgment is thus appropriately entered on this body of the claim line entries in dispute, unless Gardi can bring the unexhausted claims within one of the two narrow exceptions to ERISA's exhaustion requirement.

The Plan described the internal appeals process, as a prerequisite to ERISA litigation, and Gardi frequently availed himself of that process. Gardi claims he did so for most of the claims at issue, and that to the extent he failed to do so his failure should be excused because he was denied meaningful access to review procedures, or because his resort to those procedures would have been futile. Gardi, however, does not meaningfully explain his lack of access to the appeals process. His supplemental letter statement repeats the conclusory statement that he "lacked meaningful access" to appeal procedures [DE 137-1 at 4], but he does not describe the circumstances allegedly impeding his access.

Gardi says he made a formal appeal of United's "emerging patterns" of underpayments on HTBP claims "to the extent humanly possible," and posits that further appeals of additional claims that postdated those appeals would have been an exercise in futility given United's stance on the benefit calculations. This type of "hunch" falls far short of establishing "futility" and offers no justification for bypassing the internal review procedures which are a critical parcel of the ERISA enforcement paradigm.

As Gardi does not show how his access to the internal appeal process was impeded and does not identify any factual basis in the record showing the "futility" of further internal review on the categories of claim in dispute, he fails to raise a genuine issue of fact on his "futility' avoidance of United's exhaustion defense on the 481 claim line entries identified as unexhausted.

Accordingly, the Court's inquiry now turns to whether United abused its discretion in its interpretation and application of Plan terms governing "gap exception" coverages for the remaining seventeen claim line entries in dispute.

**B. Gardi does not demonstrate "arbitrary and capricious" denial or underpayment of claims on the exhausted claims which remain in dispute.**

United contends, and Gardi does not dispute, that United was vested with discretionary authority to interpret and apply Plan terms and decide all first and final level appeals with respect to the categories of claim at issue in this action. Thus, United's decisions are therefore entitled to deferential review. The Court's analysis on the seventeen remaining claim line entries in dispute thus focuses on whether reasonable grounds existed to support United's decisions, with the burden on Gardi to show that the decisions were unreasonable, arbitrary, or capricious. [9]

**1. Claim Line Entry Nos. 287, 288, 289, 290, 291, 295, 296, 297, 298, 299, 300, 301**

**Dates of Service**: 11/5/2020; 11/2/2020; 10/27/20; 10/28/20; 10/29/20; 10/20/20; 10/22/20; 10/19/20; 10/21/20 ; 10/14/20; 10/12/20; 10/13/20

**Medical Service**: hyperbaric oxygen under pressure - full body chamber

**Medical Provider**:  Hyperbaric Therapy of Brook Park ("HTBP")

As to these claims, United recognizes that a GAP exception was allowed and states that United paid 100 percent of the allowable amount (based on 300% of the Medicare rate prescribed in the Plan), with no application of a co-insurance requirement (since Gardi had exceeded his out-of-pocket annual maximum by these service dates).

---

[9] *See* footnote 8 *supra*.  As noted, where a Plan vests the clams administrator with discretionary authority to interpret and apply Plan terms and make final claims eligibility determinations, the Court may begin its inquiry at step 3 of the *Blankenship* paradigm and decide whether the administrator abused discretion, with the burden on the ERISA claimant to show the administrator acted arbitrarily and capriciously in denying the disputed claim.

Gardi contends United erred and abused its discretion by failing to apply a negotiated discount rate as the base "allowable amount" in its calculation of payable benefits due to this out of network provider.  United claims no such contractually negotiated rate existed with HTBP and that Gardi cannot identify any record evidence suggesting the existence of one.  Gardi, in turn, contends this assertion is belied by a prior two-year course of conduct between United and HTBP (Oct 2018 – Oct 2020) – during which United applied a much higher reimbursement rate, using the provider's fully billed charges as the base allowable amount.

As evidence for the existence of such an agreement, Gardi proffers the Affidavit of Chris Meeting, the employee of HTBP responsible for interfacing with insurance companies on patient claims.  Meeting avers that United consistently paid HTBP its fully billed charges from October 2018 through October 2020, at which point it began paying about $400 less than the regularly billed charges for hyperbaric oxygen chamber treatment. and sharply reduced the reimbursement for services involving intravenous saline infusions [DE 100 ¶¶ 4-5].  Meeting further avers she regularly negotiated claims with major insurance companies through third-party entities known as "MultiPlan" and "Data iSight," which she "understood" to have contracted with United to negotiate claims on United's behalf.  [Id at ¶ 7]. According to Gardi, this testimony at least creates a triable issue on whether a contractually negotiated rate existed with this out of network provider which United failed to apply in calculating benefits due under the Plan.

The Court disagrees.  Meeting says she negotiated discount rates with Multiplan and DataiSight for HTBP services which "are much higher than the rates that United has paid since October 2018 through October 2020."  She says she generally understood that these entities were contracted to negotiate claims with various medical providers on United's behalf – but not that they in fact negotiated a rate on behalf of United with HTBP. Further, as a threshold matter, her

18

"understanding" about MultiPlan and Data iSight's authority and alleged agency to act on behalf of United is hearsay, with no showing of how it might be reducible to admissible form at trial. The Meeting affidavit thus does not competently raise a genuine issue of material fact on the question of whether a negotiated discount rate existed under a contract between United and HTBP on the service dates in question.

This leaves only Meeting's representations regarding United's prior course of conduct, during the Oct 2018-Oct 2020 time frame, as the source of a potential contractual right. Gardi apparently advances that the existence of a negotiated rate between these entities may be implied from that course of conduct, and that United abused discretion by failing to define the "allowable amount" payable on this claim by reference to that rate. Even if Gardi's allegations about a prior course of conduct are true, he does not state a claim for relief under ERISA. His "course of conduct" theory derives from what is essentially an equitable estoppel doctrine, or the doctrine of "reasonable expectations." This raises the question of whether estoppel theories apply to an ERISA-governed employee benefit plan, such as the HCA Plan, and if a course of conduct can modify the terms of such an ERISA-governed plan.

ERISA requires that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument." 29 U.S.C. §1102(a)(1). This requirement has been held to "foreclose [] the argument that Congress intended for ERISA to incorporate state law notions of promissory estoppel." *Straub v. Western Union Telegraph Co.,* 851 F. 2d 1262, 1265-67 (10th Cir. 1988) (no liability exists under ERISA for purported oral modifications of the terms of an employee benefit plan) (citing *Nachwalter v. Christie*, 805 F.2d 956, 960 (11th Cir. 1986) (holding ERISA's writing requirement preclude soral modifications of ERISA plans and that common law doctrine of estoppel cannot be used to alter this result). This eliminates the argument that the Plan

language requiring calculation of the allowable amount (on out of network services) by reference to a contractually negotiated rate, if one exists, or by reference to the Medicare rate, if none exists, is subject to modification and extension to implied at law contracts with out of network providers.

To the extent Gardi is advancing that the prior course of dealing between HTBP and United amounts to a waiver of the Plan terms governing this formula and estops United from disavowing the existence of a contractually negotiated rate with the out of network provider in question here, this position is likewise precluded by the written instrument requirement of ERISA.   As a matter of law, Gardi cannot rely on a prior course of regular interactions between the provider in question and United to contradict the Plan terms prescribing the method for calculation of the "allowable amount" for out of network services.  *Glen Ridge Surgicenter, LLC v. Horizon Blue Cross Blue Shield of New Jersey, Inc.,*  2009 WL 3233427, at * 4, 5  (D. N.J. 2009)  (rejecting waiver of anti-assignment provision of plan based on course of  prior dealings theory where the complaint alleged a course of direct payments not authorized under ERISA plan); *Feifer v. Prudential Ins. Co. of America,* 306 F.3d 1202, 1210 (2ᵈ Cir. 1994) (ERISA's written instrument requirement "essentially operates as a strong integration clause, statutorily inserted in every plan document") (quoting *Senior Executive Benefit Plan Participants v. New Valley Corp.*, 89 F.3d 143, 149 (3d Cir. 1996)); *Lott v. Hertz Custom Benefit Program*, 961 F.2d 220 (10ᵗʰ Cir. 1992) (unpub) (common law estoppel principles do not apply to ERISA-governed benefit plan where written plan documents are unambiguous; defendant's conduct thus could not amend or modify terms of ERISA plan).

Since there is no record evidence of a contractually negotiated rate between United and HTBP governing the service dates in question, and no equitable theory available which would estop United from reassessment of its benefit calculations on HTBP claims in accordance with

express Plan terms, Gardi fails to show United abused its discretion in its processing of HTBP claims for hyperbaric oxygen services provided to Gardi.  United is therefore entitled to entry of summary judgment on this group of (exhausted) disputed claim line entries.

### 2.  Claim Line Entry Nos. 498, 499, 502, 503

**Medical Service**: Physician or other qualified healthcare professional attendance and supervision of hyperbaric oxygen therapy, per session

**Provider**: Eric R. Serrano

**Dates of Service**: 2/18/2019; 2/18/2019; 2/21/2019; 2/21/2019

United ultimately approved and paid these claims on March 26, 2019 (following an initial dispute over determination of the allowable amount) using the provider's full-billed charge as the allowable amount (reflecting a processing error it contends amounted to a windfall for Gardi). United paid 80% of the allowable amount after application of the 20% coinsurance obligation. United represents it granted a gap exception request for coverage of this service, and therefore treated Serrano as an out-of-network provider for purposes of computing the co-insurance and out-of-pocket maximums, applying an 80% reimbursement rate because Gardi had not yet exceeded his out-of-pocket maximum for the year at the time of these services.

Gardi argues these claim line entries fall into that group of 41 disputed claim line entries which United's motion fails to specifically parse, with a benefits calculation exposition, and that these claims should therefore be excepted from the sweep of any summary judgment adjudication. United acknowledges that it did not specifically illustrate its benefits calculations on these claims in its original motion, but that its motion was directed to all claim line entries in dispute which would include these entries. Identifying the claims as the target of the motion was enough, it contends, to shift the burden to Gardi, as ERISA claimant, to show how United's claims decisions

reflected an abuse of discretion in the interpretation or application of Plan terms.   It argues it was not under an obligation to spell out the rationale underlying its benefits calculations for every disputed claim line entry, and that its illustration of its decision-making processes underpinning other disputed claim line entries did not result in a shift of the burden of proof applicable to Gardi's ERISA denial of benefit claims.

The Court agrees that Gardi, as an ERISA claimant, has the initial burden of showing how United, as claims administrator, erred, or abused its discretion in its benefit determinations on the claims in dispute. Gardi does not complain or show that United's ultimate disposition of the Serrano claims resulted in a violation of Plan terms, nor does he attempt to show how its initial disposition of the claims abused discretion.   Gardi also fails to show that any delay in the processing of these Serrano claims resulted in out-of-pocket expense to him.    As Gardi does not come forward with such proofs or argument, the Court concludes United is entitled to entry of summary judgment on these disputed claim line entries.

### 3.   Claim Line Entry No. 505

**Medical Service**: Intravenous infusion, for therapy, prophylaxis, or diagnoses

**Provider:** Clifford M. Sonnie

**Date of Service**: 11/27/18

United represents it paid 25% of the allowable amount – calculated as the provider's full- billed charge, since this charge was less than 300% of the Medicare reimbursement rate.  It paid 25% of the allowable amount because this was a service provided by an out-of-network provider *without* a gap exception authorization in place.  In his supplemental submission, Gardi represents he no longer seeks to recover benefits relative to this claim line entry [DE 137-2, at 325, ¶ 505]. United's request for summary judgment upon on this line item shall therefore be granted.

**C. Gardi's demand for "foregone benefits" is not cognizable as a § 502(a)(1)(B) ERISA denial of benefits claims.**

The Court previously dismissed with prejudice Gardi's claims for prospective injunctive relief and claims for extracontractual damages, including an asserted claim for "other monetary compensation" due beyond reimbursement on the alleged wrongfully denied or underpaid claims.

In his Second Amended Complaint, Gardi alleges he was forced to forego various therapy modalities because of United's erroneous claims benefit calculations, even though United finally relented and paid some of the claims after a lengthy course of debate over the proper reimbursement rates [DE 64, ¶¶ 31-33, 43]. Gardi claims he is yet entitled to recover value for these "foregone benefits," a claim he says is beyond the scope of United's current motion and which therefore should not be adjudicated in the instant proceeding.[10]

Gardi's position on this point is summarily rejected, as his Complaint contains no cognizable claim for "foregone benefits" and an ERISA denial of benefits claim does not subsume the value of non-rendered medical services as a component of compensation. The "foregone benefits" of which Gardi complains relate to medical services Gardi chose to forego when United denied or underpaid on claims for certain medical therapies and services. Thus, he never incurred these expenses, but claims they are expenses he would have incurred (and that would have been covered by the Plan) if United had not wrongfully denied or underpaid on his original claims for these services. In his supplemental submission, Gardi says he is entitled to relief on these claims, either

---

[10] Specifically, Gardi alleges that because of United's persistent wrongful denials of coverage or underpayments on covered claims, he had to forego medically necessary treatment that his doctors ordered. As a result of that disruption in treatment, he claims his health deteriorated rapidly "as toxins built up and pathogens ravaged his body." He claims this forced him to move to Ohio to be cared for by his family (elderly parents and grandfather), as he is now "completely disabled and spends his days receiving treatment at various health care providers." He alleges he "struggles with everyday tasks like walking and showering," and internally has suffered "brain swelling and neurological damage," as well as a reemergence of a Hepatitis C infection [DE 64 at 2, ¶4].

23

by way of a directive requiring United to pay for these services in the future, in the nature of "make up" benefits, or by way of a monetary award for the value of the foregone benefits.

Although Gardi attempts to frame these damages as "denied benefits," he is effectively asking the Court for prospective injunctive relief – a demand which has been dismissed with prejudice – or for compensation for pain and suffering/ deterioration of physical condition endured because of the interruption and delays in payments owed under the Plan --a category of compensatory damages that are not allowed under ERISA.  *See e.g. Estate of Coggins ex rel. Madis v. Wagner Hopkins, Inc*., 183 F. Supp. 2d 1126 , 1132 (W.D. Wis. 2001)(damage for medications and medical care that claimant went without, including resulting pain and suffering endured because of termination of coverage, are not covered damages for "denied benefits" recoverable under ERISA), citing *Senese v. Chicago Area I.B. of T. Pension  Fund*, 237 F.3d 819, 825 (7th Cir. 2001) (under §502(a)(1)(B), authorizing suits for unpaid benefits, plan participants may not recover "extracontractual damages);  *Kuestner v Health and Welfare Fund & Pension F und of Phil. Bakery Employers, etc.,* 972 F. Supp. 905 (E.D. Pa. 1997) (to extent ERISA plan participant sought damages for deterioration in participant's medical condition suffered by loss of drug therapy, damages sought were compensatory in nature and unavailable under ERISA); *Jones v Officemax, Inc.,* 38 F. Supp. 2d 957 (D. Utah 1999) (damages from deterioration of employee's mental health, following foregoing of medical care due to lapse in health insurance coverage,  not recoverable under enforcement provisions of ERISA).

As Gardi's Complaint does not assert a cognizable claim for "foregone benefits," and as the value of these claimed benefits is not properly included as compensation for a wrongfully denied benefit claim, he identifies no claim lying outside the scope of the instant motion for summary judgment which precludes a final summary adjudication on all remaining claims in dispute.  As no

other claims remain for determination in this matter, final summary judgment is appropriately entered in favor of Untied.

    **IV.**    **CONCLUSION**

    Based on the foregoing, it is  **ORDERED AND ADJUDGED:**

1. Defendant's motion for summary judgment [DE 89] is **GRANTED.**

**2.**  The unexhausted claim line entries identified by United's motion are **DISMISSED WITHOUT PREJUDICE.**

3. Final summary judgment pursuant to Rule 58 shall enter accordingly in favor of United by separate order of the Court.

    **DONE AND ORDERED** in Chambers at West Palm Beach Florida this 11th day of March, 2022.

 

 

                                              KENNETH A. MARRA
                                             United States District Judge

cc.  all counsel